**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MICHAEL DEVITO,<br>KEITH HARRIS,<br>MICHAEL SCHULZ,<br>on behalf of Plaintiffs and the class members<br>defined below, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-08984 |
| ROBINSON ECONOMIC SERVICES,<br>also known as ROBINSON ECONOMIC<br>SERVICES, LLC, doing business as<br>CLEAR AIR LENDING;<br>ROBINSON ECONOMIC DEVELOPMENT<br>CORPORATION;<br>CT2022 FIN 1 LLC;<br>BORROWWORKS FINANCIAL, INC.;<br>BORROWWORKS DECISION SCIENCE, INC.;<br>BENJAMIN E. GATZKE;<br>JEFF FORSEY;<br>and JOHN DOES 1-20, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Martha M. Pacold |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

1.       Plaintiffs bring this action to secure redress from predatory and unlawful loans made to Illinois residents (such as Exhibits A-C). The loans are ostensibly made by Defendant Robinson Economic Services, also known as Robinson Economic Services, LLC, doing business as Clear Air Lending ("Clear Air Lending"), and its parent Defendant Robinson Economic Development Corporation ("REDC").  These entities purport to be owned by "the Robinson Rancheria of Pomo Indians of California," a federally recognized Indian tribe.  In fact, the loans are funded by CT2022 FIN 1 LLC ("CT2022"), a non-native American business located in Arkansas, which is operated by Total Management, Inc. ("TMI") (prior to dissolution), BorrowWorks Financial, Inc. ("BorrowWorks"), BorrowWorks Decision Science, Inc. ("BWDS"), Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20.

1

2.     Plaintiffs seek a declaratory judgment that the loans are void (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III—the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964 (Count IV), and damages for unjust enrichment (Count V).

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 18 U.S.C. § 1964 (RICO), 28 U.S.C. §1337 (interstate commerce),  28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4.     On information and belief, there are more than 100 members of the class, and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Defendants because they:

a.     Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016*), aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353,

2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

          b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6.      Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Illinois.

7.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiffs

8.      Plaintiffs are citizens of Illinois residing as follows:

          a.      Michael DeVito: Aurora, Illinois.

          b.      Keith Harris: Effingham, Illinois.

          c.      Michael Schulz: Chicago, Illinois.

### Defendants

### Clear Air Lending and Robinson Economic Development Corporation

9.      Defendant Clear Air Lending states on its website www.clearairlending.com that it is a "corporate subdivision of the Robinson Economic Development Corporation, a wholly owned federally chartered corporation and an economic development arm of the Robinson Rancheria of Pomo Indians of California (the 'Tribe'), a federally recognized and sovereign Native American Indian Tribe." (Exhibit D) Plaintiff disputes this. It uses the addresses PO Box 1429, Nice, CA 95464 and 1545 E. State Highway 20, Nice, CA 95464-8619.

10.     Defendant REDC is a corporation with offices at 1545 E. State Highway 20, Nice, CA 95464-8619.

11.     Clear Air Lending and REDC are the nominal makers of high-interest Internet loans via the website www.clearairlending.com.

12.     The website is registered to an address in Ukiah, California, about thirty miles from the Robinson Rancheria. (Exhibit E)

### CT2022

13.     Defendant CT2022 is a limited liability company organized under the laws of Oklahoma with its principal office at 5608 S. 14th Street, Fort Smith, AR 72901. Its registered agent and office is Capitol Document Services, Inc. 1833 S. Morgan Road, Oklahoma City, OK 73128.

14.     CT2022's principal office, 5608 S. 14th Street, Fort Smith, AR 72901, is a small office building that houses a number of high-interest lenders as well as TMI (prior to dissolution).

15.     Defendant CT2022 provides funds used to make loans via www.clearairlending.com.

16.     To secure repayment, CT2022 has filed UCC-1 financing statements (Exhibits F-G) against Clear Air Lending and REDC, disclosing a security interest in "any and all net receipts, receivables, net revenues, and rents received by the Debtor from the operation of any business or enterprise or otherwise," "all present and future deposit accounts of the Debtor, including but not limited to the Collateral Deposit Account and the Collection Account, the funds on deposit and all proceeds therefrom, and any and all certificates of deposit," "all property and assets, real or personal, tangible or intangible, now existing or hereafter acquired, of Debtor," and "Eligible Assets."

17.     "Eligible Assets" are defined as "all consumer loans made pursuant to Consumer Contracts if such Consumer Contracts:  (a) comply with the Eligibility Criteria established by Debtor and Lender; and (b) are pledged to lender and in respect of which Lender has a perfected first priority lien not subject to any other liens or claims of any kind."

18.     "Consumer Contract" is defined to mean "(a) a cash advance contract and the Truth

in Lending Act disclosure executed by a Consumer Obligor in favor of Debtor relating to an unsecured consumer loan made in conformity with all applicable Consumer Financial Services Laws and Tribal Laws with a Consumer Obligor; (b) all rights, title, and interest, including all rights of repayment, under the Consumer Contract Documents and all instruments and documents arising therefrom or relating thereto; and (c) all proceeds arising therefrom or relating thereto (including, but not limited to, any personal property (if any) acquired in connection with the exercise of any remedy relating to a Consumer Contract."

19.    "Consumer Contract Documents" are defined as "all instruments, promissory notes, documents, and agreements entered into, by a Consumer Obligor with Debtor, and evidencing or executed in connection with the application for or disclosure with respect to a Consumer Contract, including, but not limited to, a Consumer Contract."

20.    Thus, CT2022 has a security interest in all loans made via www.clearairloans.com and the proceeds of such loans. The extent of the security interest makes CT2022 the sole source of funding for loans made through www.clearairloans.com.

21.    The UCC-1 filing was made by Connor & Winters, a law firm whose declared fields of practice include Indian Law and tribal sovereign immunity, and which has previously been involved with "rent a tribe" lending operations. *Martorello v. Williams*, No. 19-MC-5-JED-JFJ, 2019 U.S. Dist. LEXIS 63881 (N.D. Okla. Apr. 15, 2019) (Exhibit H).

### TMI

22.    TMI is a Delaware corporation that is now dissolved. Its former principal business address was 1845 Shelby Lane, Fayetteville, AR 72704.

### Gatzke

23.    Defendant Gatzke is the Chief Executive Officer of TMI (prior to dissolution) and BorrowWorks. He resides at 4400 Ledgeview Rd., Fort Worth, TX 76109.

24.    As Chief Executive Officer, Gatzke is responsible for, and controls, the management and operations of TMI (prior to dissolution) and BorrowWorks, and is therefore personally

responsible for its acts, omissions, and violations.

25.     Gatzke holds a Master of Business Administration degree from Baylor University. In the university's magazine from Winter 2017, Gatzke notes that he is the "CEO of Total Management Inc." (Exhibit I) He also identifies his employer as "Total Management Inc." and his position as "President" on disclosures to the Federal Election Commission ("FEC") regarding his contributions to the Online Lenders Alliance Political Action Committee. (Exhibit J)

26.     Gatzke previously served as Chief Technology Officer at Think Finance, a now-bankrupt company which engaged in a "rent-a-bank" scheme with the First Bank of Delaware, and offered short-term online loans at interest rates often exceeding 200% annually. The loan product was called ThinkCash.

27.     After regulators investigated the First Bank of Delaware and ultimately stripped it of its bank charter, Think Finance pivoted to a "rent-a-tribe" model and made loans to consumers under the name Plain Green loans, at interest rates often exceeding 500% annually.

28.     Plain Green loans were, ostensibly, made by the Chippewa Cree Tribe of Rocky Boy's Indian Reservation, a small, impoverished tribe in a remote part of Montana. Lawsuits brought by the Attorney General for the Commonwealth of Pennsylvania and the Consumer Financial Protection Bureau resulted in the bankruptcy of Think Finance.

### Forsey

29.     Defendant Forsey resides at 7468 Prairieside Drive, Fort Worth, TX 76123.  Forsey was previously the Chief Executive Officer of ACC Management, which owned 45 different storefront payday lenders.  ACC Management is located at 5608 S. 14th Street, Fort Smith, AR 72901.

30.     Since 2011, Forsey has also been the Chief Compliance Officer of BorrowWorks.

### BorrowWorks and BWDS

31.     Defendant BorrowWorks is a Texas corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Andrew Selking at that address.

32.     Defendant  BWDS is a Delaware corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

### Does

33.     Defendants John Does 1-20 are other natural or artificial persons involved in the making or funding or collection of short-term, high-interest loans made via www.clearairlending.com.

### FACTS

34.     Defendants made loans in the name of Clear Air Lending and REDC to the Plaintiffs as follows:

| Plaintiff | Date | Exhibit | Principal | Disclosed APR |
|---|---|---|---|---|
| Michael DeVito | 12/26/24 | A | $500 | 699.7630% |
| Keith Harris | 5/27/25 | B | $1,000 | 699.9989% |
| Michael Schulz | 5/5/25 | C | $1,000 | 699.9993% |

35.     Plaintiffs made payments on the loans.

36.     Defendants wired the loan proceeds of each of the loans to Plaintiffs' respective bank accounts in Illinois.

37.     Defendants debited payments from the same Illinois accounts.

38.     Defendants claim that amounts are still outstanding.

39.     Exhibits A-C are written on standard form loan agreements used by Defendants on a regular basis.

40.     Defendants regularly make loans to individuals in Illinois at such rates.

41.     The loans were obtained for personal, family or household purposes and not for business purposes.

42.     At no time has any Defendant had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling

it to make loans to Illinois residents at more than 9% interest.

43.     Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

44.     The website www.clearairlending.com states, "The Tribe does not allow access or accept applications for this service from residents of all locations, and the service may or may not be available at your location. The location from which the tribe chooses to allow access to its jurisdiction may change from time to time without notice." (Exhibit D)

45.     Defendants were aware that Illinois and other states have rate limitations that applied to their loans.

46.     Defendants determined which states to make loans in based on their estimation of the likelihood of public or private enforcement.

47.     Defendants decided to ignore Illinois' rate limitations because they concluded that Illinois authorities were unlikely to take action to enforce them against them.

48.     Plaintiffs were in Illinois at all times.

49.     At no time did Plaintiffs visit the Tribe's lands or any business premises of any Defendant in connection with the loans.

50.     On information and belief, while the Tribe is the nominal owner of REDC and Clear Air Lending, covenants in the lines of credit used as working capital to fund loans require the Tribe to hire only investor-approved managers, underwriters, marketers, software vendors, and other service providers.

51.     On information and belief, the loan covenants also require the Tribe to waive sovereign immunity with respect to the non-tribal investors, leaving the Tribe vulnerable to legal action.

52.     Thus, the Tribe exerts no meaningful control over the business, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of tribal members to work as phone customer service representatives or similar low-level jobs.

## RENT-A-TRIBE SCHEME AND INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

53.     In an attempt to evade prosecution under usury laws of states like Illinois, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

54.     The illegal loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

55.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

56.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

57.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

58.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement

is effectively nil.

59.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

60.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

61.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote,* 961 F.3d 105 (2d Cir. 2020).

62.     The loans nominally made by Clear Air Lending and REDC are in fact funded via CT2022.

63.     The member and controller of CT2022 are business associates of Gatzke, Forsey, and ACC Management.

64.     BWDS develops and utilizes software to predict the repayment abilities of consumers who apply for online loans with exceedingly high interest rates, as well as the propensities of the consumer to actually pay the loans.

65.     Software developed by BWDS was utilized in the underwriting of Plaintiffs' loans.

66.     BWDS software is written specifically with lenders like Clear Air Lending and REDC

10

in mind, e.g., lenders which charge 400% or more interest rates.

67.     At all times, BWDS is aware its software is used in the furtherance of loans with interest rates exceeding 400% annually.

68.     TMI (prior to dissolution) orchestrated and directed the lending operation.

69.     TMI (prior to dissolution), BorrowWorks, BWDS and their contractors and hired agents are in actual control of nearly all aspects of Clear Air Lending and REDC, including underwriting, lending decisions, collection strategies, credit reporting, and the sale of charged-off debts to debt collectors.

70.     The line of credit from CT2022 provides Clear Air Lending and REDC with access to the millions of dollars in working capital it needed to fund loans.

71.     On information and belief, based on the typical contents of such agreements, the CT2022 line of credit agreement provided:

   a.     The Tribe waived any sovereign immunity claims in the event of a dispute with TMI, BorrowWorks, and BWDS.

   b.     The Tribe would employ only contractors approved by TMI, BorrowWorks, and BWDS.

   c.     Money due TMI, BorrowWorks, and BWDS would be given priority.

   d.     Various restrictive covenants that gave TMI, BorrowWorks, and BWDS control over the "tribally" operated Clear Air Lending and REDC.

72.     TMI (prior to dissolution), BorrowWorks and BWDS or their related companies approved Plaintiffs for their loans, in all meaningful ways.

73.     Any "tribal" approval was simply a charade done for the purpose of providing legal cover, and involved nothing more than a pro forma rubber-stamping of the approval generated by TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies.

74.     An applicant for a loan from Clear Air Lending and REDC who does not meet the qualifications established by TMI (prior to dissolution), BorrowWorks, and BWDS or their related

companies will not be offered a loan.

75.     The only meaningful contribution the Tribe makes is that TMI (prior to dissolution), BorrowWorks, and BWDS and/or their related companies can claim Clear Air Lending and REDC operate under Tribal law and to invoke the tribe's sovereign immunity to attempt to avoid state usury laws. Only low-level functions occurred on the Tribe's land. Clear Air Lending and REDC are not permitted to make loans denied by TMI (prior to dissolution), BorrowWorks, and BWDS.

76.     The purported beneficial owner of Clear Air Lending and REDC is a small, economically depressed, isolated tribe in rural California.

77.     Ultimately, the Tribe retains roughly two cents on the dollar of revenue generated by Clear Air Lending and REDC, after paying various management fees, consulting fees, technology fees, interest on the line of credit, and other sums to CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS.

78.     The various fees and interest have to be repaid to CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS prior to any payments to the Tribe, meaning that the non-tribal economic interests come before those of the Tribe's.

79.     In the event a particular loan is charged-off as uncollectable prior to at least the original principal loan amount being paid, CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS absorb the loss, not the tribe.

80.     Thus, CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS, and not the Tribe, are the true lenders of the loans made to Plaintiffs, because they have the predominant economic interest in loans made to consumers by  Clear Air Lending and REDC.

81.     Since nearly all meaningful activity concerning the loans made by Clear Air Lending and REDC does not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Tribe's land, the loans were not made "on" the reservation.

82.     A significant majority of the transactions occur within Illinois—from completing

the application to receiving the funds.

83.     Plaintiffs, like most customers of Clear Air Lending and REDC, acquired their loans without leaving their homes.  The loan proceeds were deposited into their Illinois bank accounts, and withdrawals and attempted withdrawals were made from the same account. Communications, including emails and text messages, were sent to Illinois.

84.     The location of the consumer determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968  (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

85.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

86.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

87.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

88.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Installment Loan]

13

Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

89.     Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

90.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

91.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

92.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *See, e.g., In the Matter of Red Leaf Ventures, LLC,* No.

14

12 CC 569); *In the Matter of Money Mutual, LLC*, No. 12 CC 408;*In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

93.     The excessive interest charges imposed by Defendants were willful.

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

94.     Plaintiffs incorporate paragraphs 1-93.

95.     This claim is against all Defendants.

96.     There is a controversy between Plaintiffs, on the one hand, and Defendants, on the other, as to whether Plaintiffs must repay the loans made to them.

97.     Declaratory relief will resolve such controversy.

98.     An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

99.     Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

100.    The class consists of (a) all individuals with Illinois addresses (b) to whom Clear Air Lending made a loan (c) at more than 9% interest (d) which loan is still outstanding.

101.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

102.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

103.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

104.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

105.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

106.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i.    Declaratory and injunctive relief;

    ii.    Restitution of all amounts collected;

    iii.    Costs of suit; and

    iv.    Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

107.    Plaintiffs incorporate paragraphs 1-93.

108.    This claim is against all Defendants.

109.    Defendants contracted for and collected loans at more than 9% interest from Plaintiffs and the class members, in violation of 815 ILCS 205/4.

110.    Plaintiffs and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

111.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

112.    The class consists of (a) all individuals with Illinois addresses (b) to whom Clear Air Lending made a loan (c) at more than 9% interest (d) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

113.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

114.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

115.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

116.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

117.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

118.    A class action is superior for the fair and efficient adjudication of this matter, in that:

        a.    Individual actions are not economically feasible.

        b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

        i.    Damages as provided in 815 ILCS 205/6;

        ii.    Attorney's fees, litigation expenses and costs of suit; and

        iii.    Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

119.    Plaintiffs incorporate paragraphs 1-93.

120.    This claim is against all Defendants.

121.    Defendants contracted for and collected loans prohibited by the Illinois Predatory

17

Loan Prevention Act.

122.     Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

123.     Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

124.     The class consists of (a) all individuals with Illinois addresses (b) to whom Clear Air Lending made a loan (c) at more than 36% interest (d) on or after March 23, 2021.

125.     Plaintiffs may alter the class definition to conform to developments in the case and discovery.

126.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

127.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

128.     Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained  counsel experienced in class actions and consumer credit litigation.

129.     Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

130.     A class action is superior for the fair and efficient adjudication of this matter, in that:

     a.     Individual actions are not economically feasible.

     b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Compensatory damages;

ii. Punitive damages;

iii. Attorney's fees, litigation expenses and costs of suit; and

iv. Such other and further relief as the Court deems proper.

## COUNT IV – RICO

131. Plaintiffs incorporate paragraphs 1-93.

132. This claim is against BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20, who are the RICO "persons."

133. All loans made by Clear Air Lending to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

134. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

135. Clear Air Lending is an enterprise affecting interstate commerce, in that it purports to be located in California and make loans to Illinois and other U.S. residents via the Internet.

136. Defendants BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20 are associated with these enterprises.

137. Defendants BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20 conducted or participated in the conduct of the affairs of this enterprise through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

138. Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

139. Plaintiffs bring this claim on behalf of a class.

140. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan

was made by Clear Air Lending at more than 18% interest (all such loans qualify) (c) which loan was made on or after a date four years prior to the filing of suit.

141. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

142. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Clear Air Lending is an "enterprise."

c. Whether Defendants BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20 are associated with the enterprises.

d. Whether Defendants BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20 conducted or participated in the affairs of these enterprises through a pattern of making and collecting unlawful loans.

143. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

144. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

145. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants BorrowWorks, BWDS, Benjamin E. Gatzke, Jeff Forsey, and John Does 1-20, for:

i.      Treble damages;

ii.     Attorney's fees, litigation expenses and costs of suit; and

iii.    Such other or further relief as the Court deems proper.

## COUNT V – UNJUST ENRICHMENT

146.    Plaintiffs incorporate paragraphs 1-93.

147.    This claim is against all Defendants.

148.    Defendants obtained money from Plaintiffs and the class members through unjust means, and should in equity be required to disgorge such money.

## CLASS ALLEGATIONS

149.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

150.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Clear Air Lending (c) at more than 36% interest (d) on or after March 23, 2021.

151.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

152.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

153.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

154.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

155.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

156.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

      i.    Appropriate damages;

      ii.    Costs of suit; and

      iii.    Such other and further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
Hkolbus@edcombs.com
ahuzyk@edcombs.com

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on October 8, 2025, I electronically filed the foregoing document via the Court's CM/ECF system, which sent notice via email to all counsel of record. I further certify that a copy of the foregoing document was sent via U.S. Mail and email to the following:

BorrowWorks Financial, Inc.
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

BorrowWorks Decision Science, Inc.
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

Benjamin E. Gatzke
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

Jeff Forsey
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

I further certify that the foregoing document was sent by U.S. Mail to the following:

CT2022 FIN 1 LLC
c/o Registered Agent
Capitol Document Services, Inc.
1833 South Morgan Road
Oklahoma City, OK 73128

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## **JURY DEMAND**

Plaintiffs demand trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\41761\Draft Amended Complaint_WPD